HUBER et al. v. GUGGENHEIM et al.

(Circuit Court, S. D. New York.    October 10, 1898.)

1. SUIT TO RESCIND CONTRACT—FALSE REPRESENTATIONS.

Representations by the owner of a patent, in negotiations for the sale of a license, that the patent is valid, and covers broadly a certain described method of manufacture, are expressions of opinion, and not statements of fact the falsity of which is ground for annulling the contract.

2. SAME—STATEMENTS OF OPINION..

Representations by a patent owner, in granting a license, that no more favorable terms "would be given" to any other manufacturer than were offered to the proposed licensee, being statements as to future action, cannot form the basis of a suit for rescission for false representations.

3. EQUITY—PLEADING AND PROOFS—CHANGE OF THEORY BY COMPLAINANT.

Under a bill to rescind a contract on the ground of false representations, no recovery can be had on the theory that the alleged false representations constituted an independent collateral parol contract, the breach of which entitled complainant to receive back the money he paid, because of defendant's failure to deliver what he had contracted to furnish.

4. SUIT TO RESCIND CONTRACT—FALSE REPRESENTATIONS.

A false statement of fact is not sufficient ground for rescission when the court is not satisfied that it induced, or even materially assisted to induce, complainants to enter into the contract.

This cause comes up for final hearing in equity upon pleadings and proofs.

The complainants are co-partners in business, and residents of St. Gall, Switzerland, their firm name being Huber & Kellet.    The defendants, Meyer, Isaac, Daniel, Morris, and Solomon Guggenheim, are co-partners carrying on business in the city of New York under the firm name of M. Guggenheim's Sons.    On May 16, 1889, as the testimony shows,—the complaint erroneously gives the date as May 18th,—complainants and defendants entered into a contract in writing at St. Gall.    This contract recited that defendants were the owners of United States letters patent No. 266,525, issued October 24, 1882, to Albert L. Rice, "for and relating to and under which they are and have been doing up embroideries in the manner known as, and to which they have applied the trade-name, 'Automatic,' * * * [and that complainants] are desirous of acquiring a license under the said Rice patent, that they may be permitted to do up embroideries in the manner known as 'Automatic,' and to import and sell the same in the United States of America, without incurring liability under or by reason of the said Rice patent."    The embroideries referred to are what are known as "Hamburg edgings," and the contract defines the manner of doing them up known as "Automatic" as being the manner "in which the parallel rows of embroidery are perforated, punctured, or indented so as to permit the rows being readily separated."    The contract provided that in consideration of $1,000 per annum such license is granted during the remainder of the term of the patent, "or until the same shall have been decreed invalid by the supreme court of the U. S."; that defendants should furnish complainants 50,000 license stamps during each year, one stamp to be placed on each piece of embroidery so done up and imported or sold in the United States;   said 50,000 stamps to be used by complainants within the year for which they are issued, and not to be sold or otherwise disposed of by others, being intended for use solely upon embroideries done up by complainants.    In case complainants did not use the 50,000 furnished to them in any one year, they were to deliver up the balance to be destroyed.    If they required additional stamps for any year, defendants agreed to furnish them at the same rate, two cents for each stamp.    Defendants covenanted to protect and defend complainants against any suit or suits brought against them for infringement of any United States letters patent by reason of their doing up any embroideries in the manner specified, and further covenanted "to protect and defend them in the

use of the invention specified in the said Rice patent." This suit was brought in February, 1892, complainants praying for a decree that the contract "was from the beginning, and is, wholly void," that the same should be delivered up to be canceled, and that all moneys paid under it should be repaid, for the reason that complainants were induced to enter into the contract by certain false representations made by defendants with intent to deceive and induce complainants to make the contract, which false representations, it is averred, complainants relied upon, and but for which they would not have entered into the contract. The facts are set forth in the opinion.

George C. Lay and Thomas P. Wickes, for complainants.

John R. Bennett and Joseph H. Choate, for defendants.

LACOMBE, Circuit Judge (after stating the facts). The claim of the Rice patent is for "a bolt of embroidery containing two or more rows separated by a line of perforations adapted to be folded and secured by ties at the folds, substantially as described." The specification contains the statement:

"I propose to manufacture the goods with a line of perforations between each row of embroidery at or near the edge of each row, as may be requisite, according to the purpose for which the goods are intended, for the purpose of separating the rows of embroidery by simply tearing off each strip from the bolt as required. To facilitate the operation, and avoid unnecessary handling, I then propose to fold the goods back and forth in a reverse manner, in one yard, or fraction of a yard, lengths, similar to the folds of a lady's fan, the end of each folding to be fastened with a thread to hold them together. The rows may then be removed in this way without having to unfold the goods, or having to resort to a measure to tell the amount being removed."

The perforations shown in the Rice patent are in straight lines. Defendants acquired this patent, having first obtained an opinion of counsel as to its validity and scope, in 1883. Thereafter they put up embroideries in the manner described, to which they applied the trade name "Automatic." They expended large sums of money in advertising and pushing such style of make-up in the trade. They manufactured and sold large quantities of the goods themselves; and to other American dealers in embroideries, their competitors in business, they sold large quantities of license stamps (at two cents each) to be affixed to foreign-made goods done up in like manner, and brought here for sale. One M. H. Pulaski, an American manufacturer, became the owner of a later patent, in which the perforations followed the scollops of the embroidery, and put up goods in accordance therewith under the trade-name "Magic." Defendants sued him for infringement, but did not press the suit, because, as they testify, the difficulty and expense of adapting machinery to follow the scollops was so great that they did not find in "Magic" goods a serious commercial competitor. All this was prior to 1889. In the last-named year defendants concluded to withdraw from the embroidery business, and seek other fields of business enterprise. They therefore sought to dispose of their rights under the Rice patent on terms as favorable to themselves as possible. The existing situation seemed to offer an opportunity so to do. Theretofore the foreign manufacturer could safely put up his goods in "Automatic" style, in large or small quantities, so long as he could effect a sale of them to an American house which bought license

stamps from the Guggenheims. If, however, the latter should change their policy, and no longer sell stamps except to the manufacturer, the United States outlet for foreign-made goods would be closed to all foreign manufacturers who did not obtain license from the Guggenheims, unless such manufacturers, or their consignees in the United States, should succeed in overthrowing the patent in the federal courts. Of this opportunity the defendants availed themselves. They decided that they would no longer sell license stamps except to a manufacturer, and that they would not sell even to him unless he would agree to take at least some specified number each year, whether he used them all or not. They made this decision known to the trade. Their first licensee under the new system was their old competitor Pulaski, the owner of the "Magic" patent, who, in February, 1889, agreed to take a license under the Rice patent for its unexpired term, upon the consideration of $2,000 per annum; that is, on the basis of 100,000 stamps each year. Their next licensee was the firm of Ulrich de Gasp Von Willer, the leading embroidery firm of St. Gall, known and hereinafter referred to as the "Union." The contract with the Union on the basis of 75,000 stamps a year was substantially the same as the one now before the court, except in two important particulars. It was to continue for two years, with an option to the Union to renew from year to year thereafter. It also contained this clause:

"Fifth. The parties of the first part covenant and agree not to hereafter license any other party or parties under the said Rice patent to do up embroideries under or in accordance therewith at a less rate of royalty than that herein specified, and that, should they so license any other party or parties under the said Rice patent to do up embroideries in the 'Automatic' style or in any other manner at a less rate of royalty than two cents (2) per stamp, one stamp to be placed upon each piece of embroidery, the parties of the second part shall be entitled to a like reduction from the date of any such reduction."

This contract with the Union was executed in New York, May 11, 1889. The third licensee was the complainants' firm, under contract above set forth. Contracts similar to complainants', except as to differences in the number of stamps required to be taken each year (and in three cases as to the period), were subsequently made with four other St. Gall houses on different dates during the same year, and with one in March, 1890. In December, 1889, defendants granted licenses to four American houses—Loeb & Schoenfeld, Steiger & Co., Einstein, Wolff & Co., and Mayer, Heine & Co.—on the basis of 12,500 stamps a year at two cents a stamp, but with a provision that defendants would furnish as many stamps as the licensee might require in excess of 12,500 free of charge. Practically each of these four contracts was an unlimited license for $250 a year, and each of the licensees used stamps largely in excess of the 12,500. Defendants sought to secure themselves against any disastrous consequences from such wholesale licensing becoming known by inserting in each of these four contracts a drastic provision enjoining secrecy as to the terms of the contract under a penalty of $5,000; but this ingenious device proved futile, and the exceptionally favorable terms granted to the four American houses became known to, or suspected by, the trade. Thereupon the Union, which had renewed under its option for a third year, brought

an action in this court to recover back all that it had paid in excess of $250 a year. In this action it prevailed, and judgment was affirmed in the circuit court of appeals. Guggenheim v. Kirchhofer, 14 C. C. A. 72, 66 Fed. 755. As already appears, complainants' contract did not contain any clause similar to the one quoted above from the Union contract, securing to the licensee a reduction to whatever rate might be exacted from some more favored licensee; and this suit is brought to rescind the contract for false representations, and to declare it "from the beginning wholly void."

The alleged false representations may be grouped under three heads:

1. As to the patent itself: The representations charged are that "the letters patent referred to in the agreement of license were valid letters patent, and that said letters patent covered broadly the right to manufacture, use, and sell all embroidery in which the parallel rows are perforated, punctured, or indented so as to permit the rows being readily separated, and that no such pieces of embroidery could be made, used, or sold without infringing said letters patent." These representations, however, appear to be expressions of opinion, not statements of fact. Prima facie, a patent duly issued under the seal of the patent office is valid. Whether or not the prior state of the art is such as to overthrow the presumption arising from its issue is a question about which opinions may fairly differ. The construction of the patent is a question of law, and whether an article infringes or not depends upon that construction. It may very well be, as defendants argue, that the written opinion of their counsel, upon the strength of which they bought the patent; the acquiescence of their competitors in business, who for years bought license stamps from them; the acceptance of a license stipulating for the payment to them of $2,000 a year by Pulaski, the owner of the rival "Magic" patent,—all justified their expressed opinion as to the validity and scope of their own patent. But it is not necessary to discuss that proposition. The representations set forth in the bill are expressions of opinion, and the very contract itself seems clearly to indicate that they were so regarded. A fact is something fixed, unchangeable; but the contract plainly contemplates that the validity or non-validity of the patent is still an open question, for it provides for payment of license fees during the remainder of the term of the patent, "or until the same shall have been decreed invalid by the supreme court." There is no hardship to complainants in insisting upon this distinction between the assertion of a fact and the expression of an opinion. Against any loss resulting from the contingency that eventually it should be found that the patent was invalid, or was not as broad as defendants represented and as complainants undoubtedly believed it to be, they were abundantly protected. Of course, if all the world acquiesced in the broad construction, and no one, not licensed, infringed it as thus construed, their situation would be the same to all intents and purposes as if the supreme court had sustained such construction. If others, not licensed, however, put up embroideries in the "Automatic" style as described in the contract, complainants would be entitled to call upon defendants to carry out their agreement "to protect and defend [complainants] in the use of the invention speci-

fied," and if defendants failed to do so, either because of their own supineness or because they were unable to satisfy the courts that their patent covered the "Automatic" as defined in the contract, viz. that manner of putting up "in which the parallel rows of embroidery are perforated, punctured, or indented so as to permit of the rows being readily separated," then there would be a breach of the contract by defendants, and complainants would be released from further compliance with its terms.

2. Representations as to what defendants would or would not do in the future: The bill charges that defendants represented "that no more favorable terms of license * * * would be given to any other manufacturer of embroideries than were offered to complainants, and * * * set forth in the agreement." Assuming that these representations were made, they were of a promissory character,—that is, as to what defendants would or would not do in the future,—and therefore, even if not carried out, they could not form a basis of a suit to set aside a contract for false representations, made before execution of such contract, and inducing the other party to enter into it, for such a suit must be based upon representations of past or existing facts. If it were understood between the parties that the licensor was to guaranty or covenant that he would give no one else more favorable terms than he gave to the licensee, and through fraud, accident, or mistake such provision was omitted from the written contract, equity would afford relief by decreeing a reformation of the contract, and, having acquired jurisdiction for that purpose, would decree appropriate relief if it appeared that there had been a breach. The bill of complaint shows that this is no such suit. In the replying brief of complainants, filed after the argument, it is sought to avail of the subsequent acts of defendants in granting unlimited licenses to the four American houses for the trifling sum of $250 each per annum, upon two theories: First it is suggested that the proof shows an oral agreement that no better terms should be given to others; that such agreement, although not embodied in the written contract, was an independent collateral one, not contradictory of the written contract, and which may be proved by parol. In support of this position are cited Rackemann v. Improvement Co., 167 Mass. 1, 44 N. E. 990, and Durkin v. Cobleigh, 156 Mass. 108, 30 N. E. 474. But this is diametrically opposed to the cause of action charged in the bill. The other theory is thus expressed:

"We do not emphasize the failure of the defendants to carry out their promise as to what they would do or what they would not do in the future as entitling us to have the contract rescinded upon the ground of fraud, so much as to entitle us to recover the money which we have paid, on the ground that defendants failed to deliver to us what they had contracted to give us."

In its support is cited Panama & S. P. Tel. Co. v. India-Rubber, G. P. & Tel. Works Co., 10 Ch. App. 515. This is a complete change of front. The bill expressly charges false representations, which, it is alleged, entitle complainants to rescind the contract upon the ground of fraud, and have it decreed void from the beginning. Defendants were not brought into court to try any cause of action other than that set forth in the bill, and no amendment has apprised them that re-

covery is sought upon a theory inconsistent therewith. It will be unnecessary, therefore, to enter into any discussion of the evidence as to what oral discussions as to terms preceded the making of the written contract, in order to determine whether complainants have that clear preponderance of proof which should always be required from a party to a written instrument who seeks to alter or supplement its specific provisions.

3. Representations as to existing facts: The bill charges that defendants represented that no more favorable terms of license had been given to any other manufacturer. There can be little doubt that the license to the Union was on more favorable terms, since it was not bound to continue paying the fixed per annum consideration for the life of the patent, but only for two years, with an option to the Union of renewing from year to year. In the event of some change of fashion, or other cause, interfering with the consumption of such embroideries, the Union would be able to save itself from loss by not renewing. There is no claim of any misrepresentation as to more favorable terms by reason of the amount of stamps required to be taken. Every one seems to have clearly understood that some manufacturers were to take more and others less; that there was to be no uniformity in that particular. The misrepresentation relied on is that it was stated that the Union had been given no more favorable terms, when in fact it had not been bound for the life of the patent. The contract was executed in St. Gall on May 16th by Jacob Huber, one of the complainants, and Solomon Guggenheim, one of the defendants, after negotiations between those two individuals. There is some testimony—conflicting testimony—as to conversations in Chicago on May 13th between Daniel Guggenheim and one Crawford, a salesman or agent of complainants' firm in this country; but such testimony is immaterial, since Crawford had no power to contract, and did not communicate Daniel's statements as to other licenses (if such were made) to his principals before they entered into the agreement with Solomon. All that Crawford informed them by cablegram was that Pulaski and the Union were licensed, and that license for complainants could be procured for $1,000 per annum. The case is narrowed down, then, to what took place in St. Gall between Huber and Solomon Guggenheim. Both men have testified, and no one else was present at their interviews. Huber says that one Brunner, a clerk in the St. Gall house of M. Guggenheim's Sons, was present; but Brunner swears that either he was not there at all, or else, if he passed in and out of the room on other business, he heard nothing of the conversation. Huber swears that he asked Solomon if the Union and Pulaski had better terms, and that Solomon said "No," that they had tickets "for the same term." Solomon denies that he made any such statement. The complainants have the burden of establishing their averment by a fair preponderance of proof, and this may be done, although the record stands oath against oath, if the court be satisfied from all the proof in the case that the complainants' narrative of the transaction is the correct one. From a careful examination of Huber's testimony, it is manifest that his memory as to this conversation is somewhat confused. He testified that Solomon told him that "the

Union and Pulaski had already signed their contract; that Alder, Rappolt & Co. had also agreed to take that amount"; that "Alder, Rappolt & Co. were going to take the same amount of tickets." It appears conclusively, by record evidence fixing the dates, that this conversation took place before May 16th, and that negotiations with Alder, Rappolt & Co. did not begin before May 17th. It is inconceivable that Solomon made these statements to Huber about Alder, Rappolt & Co., and evidently Huber's testimony is to this extent inaccurate. It is not for that reason, however, to be entirely discredited. The witness reiterates and persists in the statement that Solomon assured him that Pulaski and the Union had no better terms than were offered him. As to the term of license: Concededly, witness knew that the number of stamps varied. Huber's memory is charged only with a single negotiation with a single individual; Solomon Guggenheim's, with several negotiations about the same time with different persons. On the day in which the case at bar was argued other similar suits against the same defendants were also submitted, and from the evidence therein it appears that several witnesses assert that Solomon made similar statements to them during the same month. It was a natural question for Huber to put as to the term of the licenses to Pulaski and the Union, and the reply which he says Solomon made to him is the one which it might naturally be expected that he would make. Defendants' counsel argue that it is highly improbable that Solomon would have stated the Union was licensed for the life of the patent, when, by stepping across the street to the headquarters of that firm, an inquirer could ascertain that such statement was false. This argument has force only upon the hypothesis that Solomon's alleged statement was a willful falsehood. The conclusion reached here, however, is that Solomon, when he had his interview with Huber, supposed, and had good reason to suppose, that the Union had taken a license for the life of the patent. Before he left the United States to come to St. Gall for the purpose of effecting these contracts of license, he knew that Pulaski had taken one for the life of the patent. While it was expected and arranged among the members of his firm, before he started, that the amount of stamps was to vary with the licensee, and that in a general way the firm was to make the best terms it could, and might in some instances have to yield in some particulars, it was the expectation that all were to be licensed alike at two cents per stamp, and for the life of the patent. Forms of contract were prepared, and duplicate copies of them made, which he took with him, intending to use the same form for all. The only information he had up to that time received from his firm in New York was the statement contained in cable of May 13th, "Union are licensed." When he received this curt announcement, unaccompanied with any suggestion that the contract with the Union had been specially modified, it was to be expected that he would assume that the Union had accepted the general form of contract, and that he would govern his own conduct and speech accordingly. A most suggestive piece of evidence is found in a letter from Solomon to his firm in New York under date of May 18th. Apparently he had by that time learned that there were peculiarities about the Union contract. He writes: "Another

thing we find very peculiar is that you did not let us know on what terms you took the Union in. We cannot understand how you could neglect so important a thing as this. You ought to know it is impossible for any man, if approached on so important a matter, to be able to talk intelligently. He must be kept well posted." Whatever may have been Solomon's recollection, when he testified, as to the statements which he made five years before, touching the term of the Union license, it seems as if at the time he wrote this letter he was conscious of the fact that his brothers' carelessness in failing to advise him fully had led him to make statements, in his effort "to talk intelligently," which might better have been left unsaid.

Although inclined, for the reasons indicated, to accept complainants' version of the conversation as to the terms of the Union license as the more correct one, the court is not satisfied that it induced, or even materially assisted to induce, complainants to enter into the contract. The situation of the Union was peculiar. They were licensed under the rival "Magic" patent. If a contest were to be precipitated with the Guggenheims as to the validity and scope of the Rice patent, the Union was in a better position to make the fight than were any of the other Swiss houses. It was quite to be expected that better terms would be granted to a concern thus situated, and the complainants themselves shared such expectation. "I particularly asked him if the Union and Pulaski had better terms," says Huber, "because I had heard of the 'Magic,' and supposed they got in on better terms than we did." The complainant Huber, in response to his counsel's questions, testifies that his firm relied upon Solomon's statements, and that otherwise they would not have signed the contract. Conceding, for the purposes of the argument, that this, although couched in general terms, is a declaration that they would not have signed had they not relied on Solomon's statement as to the terms of the Union license, it is not controlling of the question now presented. It may very well be that, testifying several years after the event, irritated and justly indignant at the conduct of the Guggenheims in disposing of license stamps wholesale to the American houses for a nominal consideration, while at the same time they insisted on exacting from the foreign houses the full pound of flesh stipulated in their bonds, the witness persuaded himself that the statement as to the period for which the Union had agreed to take a license was a momentous and a material one. But when the entire body of the testimony is examined, the court reaches a very different conclusion as to the frame of mind of the Swiss licensees when these contracts were entered into. The inducing cause was their belief that the Rice patent was a valid one, and that it covered the "Automatic" manner of putting up, so that no one could dispose of embroideries in the United States except under license from the owner of that patent. Every manufacturer, therefore, who had found in the United States an outlet for his goods, was anxious not to be deprived of that outlet, nor to have his American customers get in the habit of going to some other house because he could no longer supply licensed "Automatics." The history of the whole transaction as disclosed in the record shows beyond peradventure that it was this belief, and the stringency of the situation brought about by defend-

ants' decision not to sell any more stamps to jobbers, which were the controlling elements in the situation, and it is difficult to persuade one's self that complainants and every other one of the Swiss licensees would not have signed their contracts for the life of the patent with equal promptitude although advised before doing so that the Union (a licensee under the "Magic" patent) had been given a license for two years, with privilege of yearly renewal. For these reasons the court is of the opinion that complainants have failed to sustain the averments of their bill, which must therefore be dismissed, with costs.